Granger, C. J.
In so far as the finding of the trial court negatived Brown’s charges of fraud, deceit, or bad faith, it is supported by the evidence. But a serious question remains touching the nature and extent of Griffith’s interest in the Holmes decree, in the bank judgment, and in the Irving mortgage.
Prior to the payments made on August 28, 1876, by the hands of Osborn & Swayne, Brown sustained no relation to the Holmes decree, or to the judgment in favor of the bank, except that of the debtor whose property could be sold *459 under them. Mrs. Holmes could sell her decree at her own pleasure; her vendee taking all of her rights therein. Griffith could have paid her off, and, taking her assignment, would thereby have become Brown’s judgment creditor. But the judgment would, in such case, be the debt itself, and not a collateral security. Griffith did not have the money to so buy. He loaned stock to Brown upon the latter’s promise to return it in sixty days, etc. For the time being the stock was Brown’s. He pledged it to secure his own note to the bank; but as part of the arrangement the bank was directed to place the proceeds of his notes in the hands of Osborn & Swayne to be paid to his judgment creditors, and he authorized these attorneys to accept a transfer of the decree to Griffith, and of the judgment to themselves as trustees, instead of receipts in full cancelling both. If Griffith had pledged his stock and raised the money on his own note, the sums paid upon the decree and the judgment would have been his money, and the transfer of the decree would have made him its absolute owner. The papers then executed by Brown and Griffith, taken literally, treat the money*as Brown’s, treat Brown as having, by the payment, become the owner of judgment and decree; and state that he had deposited with Osborn & Swayne, for Griffith, assignments of both as collateral security for the fulfilment of his contract with Griffith. If such were indeed the fact, what did Griffith take by such deposit ? A pledgor transfers to his pledgee the pledgor’s rights in the thing pledged as a security. The right of a judgment debtor (who has paid the judgment against himself in full) in the judgment so paid is simply a right to have it cancelled, or released, or entered satisfied. Such a right cannot be pledged. It is not a thing capable of transfer to another. Its purchaser cannot take anything. If an attempt be made to pledge it to a party having notice that it has been paid, and the pledgee, after default, puts the supposed pledge to sale, and by consent of the pledgor buys it in himself, what does he buy and hold? Simply the right of the pledgor in the pledge, released from the *460 lien of the pledgee ; not a right to collect the judgment (for the judgment debtor — the pledgor — had no right to collect anything on the judgment), but only the right to treat it as a paid, judgment.
Hence, if the money that was paid to Mrs. Holmes was Brown’s money, the payment took all life and force from her decree; she had nothing that she could transfer to any one. Brown’s request that she assign it to Griffith, and her compliance, had precisely the same effect (no more) as Brown’s own assignment of the decree, made after the payment, would have had. Brown’s pledge of the decree to Griffith, who knew of the payment, was valueless, because it placed in Griffith’s attorney’s hands a thing that had no value. The fact that that thing was, with Brown’s consent, bid in by Griffith, and that Brown thereafter released to Griffith all Brown’s rights in it, could not give it any value. All contracts to pledge, sell, buy and release, rights in “nothing,” where both parties know the facts that make it “ nothing,” are powerless to create value in the “ nothing.”
So, if the trial court had held Griffith to the letter of the contract, Brown was entitled to an injunction forbidding the collection of any money on the decree. But Brown was asking equity to aid him, and therefore he must do equity.' Equity looks through form and deals with substance, whenever settled construction, or statutory enactment, has not made “ form ” matter of substance;
The transactions of August, 1876, were parcels of one whole. Brown could not obtain the money without Griffith’s help. The loan of the stock was made upon the condition that the money to be obtained from the bank should be placed in the hands of Griffith’s lawyers, and used by .them to get from Mrs. Holmes an assignment of the decree to Griffith. All parties intended that Griffith should have a valuable interest in a live decree; a decree capable of being enforced as such. Equitj', therefore, must and will give effect to that intent. This can only be done by treating the money paid' to Mrs. Plolmes as Griffith’s money, and *461 treating Griffith as a purchaser of her rights in the decree. As Brown could not pledge Mrs. Holmes’ rights, the language of the paper of August 28th, 1876, cannot apply to this transfer from Mrs. Holmes, either as making it a pledge, or as affecting Griffith’s right to sell the decree. The trial court seems to have perceived this equity of Griffith; but it failed to see its effect upon the so called sale of the judgment as a pledge. It is true that a purchaser at such sale, without notice, would have taken Brown’s rights (which as we have seen were “ nothing ”) and also Griffith’s; he would have owned the decree as Mrs. Holmes owned it. But that would not result from Brown’s consent, however evidenced, but from Griffith’s actual ownership of the decree, and his consent to the sale, which would estop him from thereafter setting up any title to the decree.
As essential to such holding as to Griffith’s equity, it follows, that the account between him and Brown, at the close of the transaction of August 28, 1876, stood thus: Griffith had loaned to Brown $22,000 of stock; Brown had advanced to Griffith in money, $21,760.53. Of this $600 was paid to Griffith and his attorneys, and $25 to the lawyers of the bank. Waiving and not deciding the question of usury, Brown was, on the morning of August 29, 1876, indebted to Griffith as follows :
On the Holmes decree, $13,808.65
On the bank judgment, 7,233.33
For balance on said stock, 958.02
Total, $22,000.00
Brown had a right to pay both judgments and the balance of $958.02, by returning the stock within the time stated in their agreement. If he failed to do so he had agreed to pay Griffith interest on the whole debt at 8 per cent, and count the stock as worth 20 per cent, premium.
Another necessary result of the recognition of Griffith’s equity, was that he held the decree and judgment as owner; *462 and not as collateral security. They werepareel of Brown’s debt to him, and not pledges securing that debt.
This follows inevitably the holding that the money paid to Mrs. Holmes and to the bank, was Griffith’s money, and not Brown’s.
The trial courts, in effect, found that, on August 29, 1876, Brown owed
To the bank on his notes, .... $22,225.00
To Griffith for the stock, .... 22,000.00
On the decree and judgment, . . . 21,041,98
Total, $65,266.98
Brown in fact then owed
To the bank on his notes, $22,225.00
To Griffith on decree and judgment, 21,041.98
To Griffith balance on stock, 958.02
Total, . . $44,225.00
As before stated this debt to Griffith could be paid in stock before default, and bore no interest until default.
Another necessary result of the recognition of Griffith’s equity, is that Brown is not entitled to credit for the $5,000 bid, on February 28,1877, by Griffith for the decree; nor for the $3,000 bid for the bank judgment. Under the holding as to his equity, Griffith owned both decree and judgment before, at the time of and after said so-called sale. The sale was a nullity so far as concerned the judgment and decree.
Brown’s release of all Ms rights in the judgment and decree made on November 12, 1877, as already stated, passed nothing: He had no rights as to decree and judgment except to pay the balances due upon them.
What effect had Griffith’s release (in the same paper) of Brown “ from all further liability by reason of said contract, or any indebtedness thereunder arising ? ”
This must be construed in the light of the facts and circumstances. These plainly show that the words “ all further liability” did not apply to either decree or judgment. *463 The indebtedness referred to by said paper of November 12, 1877, is the indebtedness described in Griffith's letter of February 6, 1877. That letter, and Brown’s reply, show that both parties supposed that Brown then owed Griffith $27,177.25, besides owing the decree, the judgment, and the other collaterals. The credits reported to Brown, after the sale of February 28, 1877, were expressly stated to be credits on indebtedness other than the decree and judgment. And the “all further liability” released by the paper of November 12, 1877, was, (all of it,) other than the decree and judgment.
In short, the credit of the $8,000 was nothing but imaginary proceeds of the sale of two “ nothings; ” Griffith’s release of November 12, 1877, was the surrender of an imaginary “further liability;” and Brown’s surrender of his rights in the judgment and decree was a surrender of imaginary rights.
A recognition of Griffith’s equitable right to be treated as purchaser of the rights of Mrs. Holmes, and of the bank, necessarily involves a recognition of the imaginary value— the nothingness of all of said subsequent transactions touching the judgment and decree, as between Brown and Griffith. Thus the credits of $5,000 and $3,000 to Brown should be cancelled; Griffith’s rights in judgment and decree must remain unaffected by the sale of February 28, 1877, or by the release of November 12, 1877, and Brown’s surrender of his rights in judgment and decree should be treated as a transfer of nothing.
If good faith was observed, and the facts as to the. sale of February 28, 1877, Brown’s antecedent consent and subsequent ratification of that sale, -were as found by the trial courts, Brown is entitled to credit on his indebtedness to Griffith, as we have stated it, for the proceeds of sales made that day of all so-called collaterals, that were, in fact and law, the subject of pledge; — and Griffith, from and after such sale, was absolute owner of such collaterals. He is not bound to account to Brown for profits thereafter made by him out of such collaterals so bought by him ; nor for the *464 proceeds of any sale of either judgment or decree. As soon as Griffith sold either of them to a third party Brown ceased to owe him a sum equal to the actual amoúnt then due upon the judgment or decree, so sold, and became indebted in that sum to the purchaser from Griffith. Brown is not entitled to any credit for any part of the consideration received by Griffith for his sale of the decree to Milburn. As owner of the decree Griffith could sell it at his own pleasure, and Brown has no right to inquire into that consideration.
The note and mortgage of Francis A. Brown and T. P. Brown to John D. Irving, for $5,000, bore date July 24, 1876. The note was payable six months after date to the order of Irving, and was indorsed in blank by him. Both were in possession of T. P. Brown on August 28, 1876, and were by him delivered to Griffith’s attorney as his pledge to secure his debt to Griffith.
Under these facts the law presumes that the signatures of Mrs. Brown and of Irving were for T. P. Brown’s accommodation. See Erwin v. Shaffer, 9 Ohio St., 48. Griffith was bound to take notice of this presumption. Unless the sale of February 1877 passed to the purchaser of this note and mortgage the indebtedness of Brown to Griffith secured by it, such purchaser took only Brown’s rights in the note and mortgage. But Brown could not call upon his accommodation co-maker, or indorser, to pay to him anything on the note or mortgage. The purchaser at the sale of February 1877, if he then bought only this note and mortgage, could not collect anything on them because Brown could not. Such a pledge must lose vitality or value, so soon as it becomes separated from the indebtedness it was pledged to secure. As it happened — Griffith, the nominal purchaser, owned that indebtedness, and when he assigned to Milburn he expressly assigned to him a share of that indebtedness. Thus, in fact, the pledge was not separated from the debt secured by it. Without repeating the reasoning touching the judgment, it is sufficient to here say that neither Mil-burn, nor Griffith, can treat this mortgage, or note, as an *465 independent debt; it does not add a single cent to Brown’s liabilities. So soon as his indebtedness to Griffith shall have been paid Brown will be entitled to a surrender of the Irving mortgage and note. The credit of $1,00.0 proceeds of sale of this mortgage and note, as of February 28, 1877, should be cancelled for the reasons stated while treating of the $8,000 supposed proceeds of the sale of the decree and judgment.
Milburn stands in Griffith’s shoes. He can enforce collection on decree, or mortgage, or both of whatever balance is actually due from Brown upon it, under the views herein before stated. If that sum exceeds the amount of the interest of the bank in said judgment, the excess will belong to Milburn. An account should be taken to ascertain what sum, if any, is due and unpaid upon each of said judgments; whether there was anything due to Griffith from Brown besides said judgments; and a decree should be made securing to each party his rights upon the principles hereinbefore stated.

Judgment reversed.

Martin and Macaitley, JJ. dissent.